IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

**FILED**

**June 6, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 23-746

LAWYER DISCIPLINARY BOARD,
Petitioner,

v.

SCOTT A. CURNUTTE, a member of the West Virginia State Bar,
Respondent.

Lawyer Disciplinary Proceeding
Nos. 22-02-028, 22-01-133, 22-03-226, and 23-02-082

LAW LICENSE SUSPENDED AND OTHER SANCTIONS

Submitted:  April 23, 2025
Filed:  June 6, 2025

Rachael L. Fletcher Cipoletti, Esq.
Chief Lawyer Disciplinary Counsel
Renée N. Frymyer, Esq.
Lawyer Disciplinary Counsel
Office of Lawyer Disciplinary Counsel
Charleston, West Virginia
Attorney for Lawyer Disciplinary Board

Scott Curnutte, Esq.
Elkins, West Virginia
Respondent

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE WOOTON concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1. "'A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board ("HPS")] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [HPS's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [HPS's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.' Syllabus point 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994)." Syllabus Point 1, *Law. Disciplinary Bd. v. Cain*, 245 W. Va. 693, 865 S.E.2d 95 (2021).

2. "'This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions[,] or annulments of attorneys' licenses to practice law.' Syllabus point 3, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984)." Syllabus Point 2, *Law. Disciplinary Bd. v. Cain*, 245 W. Va. 693, 865 S.E.2d 95 (2021).

3. "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure . . . requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence." Syllabus Point 1, in part, *Law. Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995).

i

4.     "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows:  'In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors:  (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."  Syllabus Point 4, *Off. of Law. Disciplinary Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

5.     "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession."  Syllabus Point 3, *Comm. on Legal Ethics of the W. Va. State Bar v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

WALKER, Justice:

Over the course of approximately one year, the Office of Lawyer Disciplinary Counsel (ODC) received four separate complaints against Scott A. Curnutte, all relating to his inaction and failure to communicate. When notified of the complaints, Mr. Curnutte engaged with ODC initially, but eventually began ignoring that office just as he had his clients. The formal statement of charges against Mr. Curnutte sought discipline based on the misconduct alleged in the complaints and his failure to communicate with ODC. After a hearing, the Hearing Panel Subcommittee (HPS) of the Lawyer Disciplinary Board (LDB) found that ODC proved the charges and recommended a six-month suspension of Mr. Curnutte's license, among other things. Mr. Curnutte acknowledges his neglect of ODC's requests, and he contends that an admonishment is the appropriate sanction for that ethical violation, but he denies that ODC proved the other charged violations. Because we find that all charged misconduct was clearly and convincingly established before the HPS, and due to the presence of several aggravating factors, a six-month suspension of Mr. Curnutte's law license is called for along with the other sanctions recommended by HPS.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Curnutte is a solo practitioner in Elkins who has practiced law in this state since 1991. On December 27, 2023, the Investigative Panel of the LDB filed a four-count Statement of Charges against him, and on April 29, 2024, the HPS conducted a

1

hearing on them. Each charge and the HPS's findings based on the evidence presented at that hearing are summarized in turn below.

## A. *Count I – McFarlan Property Dispute*

Terry L. McFarlan retained Mr. Curnutte to represent him in a property dispute against the owners of adjoining property. Mr. Curnutte filed an action to quiet title on Mr. McFarlan's behalf, and the parties reached a settlement at mediation in July 2019. The terms of the settlement required the parties to survey relevant portions of their respective properties and execute and record new deeds to quiet their respective titles. Mr. Curnutte and opposing counsel, Frank Bush, prepared new deeds, but after they were recorded, Mr. McFarlan received a notification from the tax office of an issue with the deeds.

Mr. McFarlan returned to Mr. Curnutte, seeking to remedy the issue with the recorded deeds. Mr. Curnutte prepared a second set of deeds, but Mr. Bush concluded that they did not accurately reflect the parties' mediated agreement, so Mr. Bush advised his clients not to execute them. Mr. Curnutte prepared a third set, but Mr. Bush also found those unacceptable. In response to a request from ODC, Mr. Bush advised that he had conveyed an offer to Mr. Curnutte that would fully resolve the case, but Mr. Curnutte had not responded.

2

By the time of the April 2024 hearing before the HPS, years had passed since Mr. McFarlan's property dispute was settled, and he still did not have a corrected deed for his property. At the HPS hearing, Mr. McFarlan testified that he called Mr. Curnutte numerous times to resolve the issue, but Mr. Curnutte did not respond or resolve the issue.

Because Mr. Curnutte neglected Mr. McFarlan's case and failed to take appropriate action, the HPS found that Mr. Curnutte violated Rule 1.3 of the Rules of Professional Conduct (diligence). Based on his failure to keep Mr. McFarlan informed of the status of the matter and to respond to his requests for information, the HPS found that Mr. Curnutte violated Rules 1.4(a)(3) and (a)(4) (communication). Relying upon his failure to make reasonable efforts consistent with Mr. McFarlan's stated and agreed-upon objectives, the HPS also found that Mr. Curnutte violated Rule 3.2 (expediting litigation).

Further, the HPS found that Mr. Curnutte violated Rule 8.1(b) (bar admission and disciplinary matters) because Mr. Curnutte failed to comply with ODC's lawful requests for information. After Mr. McFarlan filed his complaint and Mr. Curnutte responded, Mr. Curnutte appeared at ODC pursuant to a subpoena in February 2022 to provide a sworn statement. Mr. Curnutte said that he had spoken with Mr. Bush recently to finalize the deeds and that he hoped to resolve the matter "within a very short period of time." So, ODC requested an update in September 2022, but Mr. Curnutte ignored the request. He then failed to respond to ODC's requests for status updates sent in April 2023, May 2023, and September 2023.

**B.**     *Count II – Lambert Estate Matter*

John R. Lambert retained Mr. Curnutte in 2016 to pursue an elective share of his wife's estate following her death. Shortly after he was retained, Mr. Curnutte filed a petition for elective share on Mr. Lambert's behalf with the Tucker County Commission. The petition remained pending in the county commission for several years before it was removed to circuit court in late 2018 or early 2019. In 2020, the circuit court entered an order finding for Mr. Lambert on disputed issues, thereby leaving for resolution satisfaction of the elective share. A settlement was later reached that should have resulted in payments being made to Mr. Lambert, but as of the date of the hearing before the HPS, Mr. Lambert had received no money from his wife's estate. Mr. Lambert indicated that Mr. Curnutte refused to take action in the matter, speak with him on the phone, or meet him in person. For his failure to make reasonable efforts consistent with the stated and agreed-upon objectives of Mr. Lambert, the HPS found that Mr. Curnutte violated Rule 3.2 (expediting litigation).

As with the McFarlan matter, Mr. Curnutte was also found to have violated Rule 8.1(b) (bar admission and disciplinary matters). After ODC opened a complaint in this matter, it informed Mr. Curnutte that it expected a response. He did not respond to that request, but he did respond to the complaint after a subsequent request. After providing that response, Mr. Curnutte also provided a sworn statement in February 2023 pursuant to a subpoena. In his sworn statement, Mr. Curnutte indicated that he anticipated resolving

4

the Lambert matter in a matter of months and that he would inform ODC once resolved. But Mr. Curnutte disregarded ODC's requests for status updates in April 2023, May 2023, and September 2023.

### C.  *Count III – Orrillo Matter*

After Mr. Curnutte was appointed to represent Edwin A. Orrillo in a criminal matter, Mr. Orrillo filed a complaint alleging that Mr. Curnutte had failed to communicate with him.  But we need not address the details of Mr. Orrillo's complaint because ODC only charged, and HPS only found, a violation of Rule 8.1(b) (bar admission and disciplinary matters) in relation to Mr. Curnutte's representation of Mr. Orrillo.  ODC twice requested—in June 2022 and July 2022—that Mr. Curnutte respond to Mr. Orrillo's complaint, and Mr. Curnutte twice failed to respond.

### D.  *Count IV – Kramer Mediation Matter*

On April 29, 2022, Mr. Curnutte served as a mediator in a family court matter to modify a parenting plan to which Adam T. Kramer was a party.  At that mediation, the parties reached an agreement, which Mr. Curnutte said he would memorialize over the upcoming weekend.  Mr. Curnutte never prepared the agreement.  Several weeks after the mediation, the opposing party withdrew from the mediated agreement, which Mr. Kramer attributed to Mr. Curnutte's failure to prepare the agreement.

At the HPS hearing, Mr. Curnutte argued that Rule 43 of the Rules of Practice and Procedure for Family Court, which requires a mediator to reduce to writing any mediated agreement within five days of the mediation, did not apply to him. Specifically, Mr. Curnutte asserted that Rule 43 applies only to court-ordered mediation, not to the private mediation that he claimed he performed. He also claimed that there was no longer any agreement to memorialize because the opposing party reneged over the weekend that he was to reduce the agreement to writing. But the e-mail he produced to substantiate the opposing party's withdrawal from the agreement was dated nearly a month after mediation.

Finding that Mr. Kramer testified that the mediation was court ordered, that Mr. Curnutte admitted in his Answer to the Statement of Charges that the mediation had been ordered by the family court, and that Rule 43 does not condition its requirements on mediation being court ordered, the HPS found Mr. Curnutte to have violated Rule 3.4(c) of the Rules of Professional Conduct (fairness to opposing party and counsel) for failing to comply with Rule 43 of the Rules of Practice and Procedure for Family Court. And because Mr. Curnutte engaged in dilatory conduct by failing to prepare the mediation report or otherwise advise the family court of the outcome of mediation, he was found to have violated Rule 8.4(d) of the Rules of Professional Conduct (misconduct).

Finally, Mr. Curnutte failed to respond to ODC's lawful requests for a response to Mr. Kramer's complaint made in March 2023, April 2023, May 2023, and

September 2023. So, as in all preceding counts, Mr. Curnutte was found to have violated Rule 8.1(b) (bar admission and disciplinary matters).

**E.    *Recommended Sanction***

For the eleven ethics violations it found Mr. Curnutte committed, HPS recommended the following sanction:

> A. Respondent's law license be suspended for a period of six months;
>
> B. That Respondent must comply with the mandates of Rule 3.28 of the Rules of Lawyer Disciplinary Procedure;
>
> C. That Respondent be required to petition for reinstatement pursuant to Rule 3.32 of the Rules of Lawyer Disciplinary Procedure; and
>
> D. That Respondent be ordered to pay the costs of these proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

After HPS issued its report and recommended disposition, ODC filed a consent to the recommended disposition. Mr. Curnutte filed an objection.

## II.  STANDARD OF REVIEW

In lawyer disciplinary proceedings, we utilize the following standard of review:

7

A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board ('HPS')] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions . . . . On the other hand, substantial deference is given to the [HPS's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syllabus point 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).[1]

And while we give "respectful consideration to the [HPS's] recommendations," we "ultimately exercis[e our] own independent judgment"[2] because "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions[,] or annulments of attorneys' licenses to practice law."[3]

## III. ANALYSIS

Mr. Curnutte admits to the four violations of Rule 8.1(b) of the Rules of Professional Conduct found by the HPS for his failure to respond to ODC's lawful requests for information in the McFarlan property dispute, the Lambert estate matter, the Orrillo matter, and the Kramer mediation matter; but he denies the remaining alleged violations

---

[1] Syl. Pt. 1, *Law. Disciplinary Bd. v. Cain*, 245 W. Va. 693, 865 S.E.2d 95 (2021).

[2] *Id.*

[3] *Id.* at 695, 865 S.E.2d at 97, Syl. Pt. 2 (quoting Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984)).

8

that were found in the McFarlan, Lambert, and Kramer matters.[4]  He also disagrees that a six-month suspension of his law license is warranted, arguing instead that an admonishment suffices.

We begin with a review of the evidence adduced before the HPS to support the violations found, mindful that while "Rule 3.7 of the Rules of Lawyer Disciplinary Procedure . . . requires the Office of Disciplinary Counsel to prove the allegations of the formal charge by clear and convincing evidence,"[5] before this Court "[t]he burden is on the attorney at law to show that the factual findings are not supported by reliable, probative, and substantial evidence on the whole adjudicatory record made before the [HPS]."[6]

A.    *McFarlan Property Dispute*

In the face of undisputed evidence that he never completed the preparation of corrected deeds, Mr. Curnutte maintains that the property dispute was "convoluted" and

---

[4] In denying that he committed any violations of the Rules of Professional Conduct save for failing to respond to ODC, Mr. Curnutte includes a discussion about the adequacy of his representation of Mr. Orrillo.  As stated above, Mr. Curnutte was neither charged with nor found to have violated any rule related directly to that representation.  Rather, Mr. Curnutte was charged with and found to have violated only Rule 8.1(b), and he admits to violating that Rule, so we need not address his arguments concerning the adequacy of his representation.

[5] Syl. Pt. 1, in part, *Law. Disciplinary Bd. v. McGraw*, 194 W. Va. 788, 461 S.E.2d 850 (1995).

[6] *McCorkle*, 192 W. Va. at 290, 452 S.E.2d at 381.

9

further "complicate[d]" by "competing surveys," "competing claims of adverse possession," and "a possible heir with a fractional interest." He also contends that he prepared multiple sets of deeds, so he could not have been found to have failed to act diligently (Rule 1.3), to have failed to communicate (Rules 1.4(a)(3) and (a)(4)), or to have failed to expedite the litigation (Rule 3.2).

Rule 1.3 of the Rules of Professional Conduct requires that "[a] lawyer shall act with reasonable diligence and promptness in representing a client," and HPS found that Mr. Curnutte violated this rule by failing "to take appropriate action in the matter." Mr. Curnutte argues that complicating factors prevented the resolution of Mr. McFarlan's property dispute, not any lack of diligence on his part. Before the HPS, however, he acknowledged that the issues he cites here were not impediments to preparing corrected deeds:

> Q:      . . . So is there any reason the fact that there's a title issue on—maybe on tract A, B, C, or D, or all of them, is there any reason that that should holdup getting the corrected deeds?
>
> A:      No.
>
> . . . .
>
> Q:      Okay. I mean, there may be adverse possession issues. There may be any number of things. Okay. So that's a complicating factor, but that's no reason that these deeds can't be completed?

A:     Correct.

And even though the opposing parties/adjoining landowners may have sold some or all of their property at issue here, Mr. Curnutte acknowledged that the adjoining landowners' successor in title "is on actual notice," and he agreed that *that* posed no obstacle to correcting the deeds. Further still, in the sworn statement Mr. Curnutte gave to ODC that predated the HPS hearing by more than a year, he said he hoped to resolve the McFarlan matter in short order. Yet, as of the date of the 2024 HPS hearing, despite the case having settled in 2019 and a settlement offer having been communicated to (but not responded to by) Mr. Curnutte, Mr. McFarlan was still without a corrected deed to his property. So, there was clear and convincing evidence that Mr. Curnutte failed to act with reasonable diligence and promptness in representing Mr. McFarlan, in violation of Rule 1.3 of the West Virginia Rules of Professional Conduct.

We likewise find that ODC proved by clear and convincing evidence that Mr. Curnutte violated Rules 1.4(a)(3) and 1.4(a)(4) by failing to keep Mr. McFarlan informed as to the status of the matter and by failing to respond to Mr. McFarlan's requests for information. Those subsections of Rule 1.4 require that "(a) A lawyer shall: . . . (3) keep the client reasonably informed about the status of the matter; [and] (4) promptly comply with reasonable requests for information." Before the HPS Mr. McFarlan testified that he attempted to contact Mr. Curnutte "several times, and "[m]ost of the time" Mr. Curnutte's secretary said that Mr. Curnutte would "call you right back." Mr. McFarlan testified that that return call "never happened several times. And I—just on and on, the

11

same thing. Never got no callbacks. And I'd call again in another couple weeks with no response." Mr. McFarlan testified that, as of the date of the HPS hearing, he and Mr. Curnutte had not spoken in two years.

Although Mr. Curnutte denied these failures to communicate, it is clear that the HPS resolved that credibility contest in Mr. McFarlan's favor. Near the close of the HPS hearing, one if its members remarked to Mr. Curnutte that

> when you explain that you do communicate with [your clients] and you have communicated with them, it appears you're sincere. But . . . when you clearly don't communicate with ODC, then it creates a credibility issue in the back of my mind. Why would you be good at communicating with your clients when you're not communicating with the ODC? But that's my concern in—in the [c]ase."

As stated above, we give "substantial deference" to the HPS's findings of fact, unless those findings are not supported by "reliable, probative, and substantial evidence on the whole record."[7] This is because the HPS "hears the testimony of the witnesses firsthand and, being much closer to the pulse of the hearing, is much better situated to resolve such issues as credibility."[8] The HPS resolved that credibility issue, and we defer to its resolution. Mr. Curnutte has not satisfied his burden of showing that the HPS's findings that he failed to keep Mr. McFarlan informed and failed to comply with his

---

[7] *Cain*, 245 W. Va. at 695, 865 S.E.2d at 97, Syl. Pt. 1, in part.

[8] *McCorkle*, 192 W. Va. at 290, 452 S.E.2d at 381.

12

reasonable requests for information were contrary to the reliable, probative, and substantial evidence on the record before the HPS.[9]

The final challenge Mr. Curnutte mounts to the HPS's findings regarding his representation of Mr. McFarlan concerns the violation of Rule 3.2. Rule 3.2 requires that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the client." Mr. McFarlan sought a corrected deed to his property for years following the settlement of his property dispute, but for no justifiable reason, that deed remained unprepared at the time of the HPS hearing. As Mr. McFarlan testified, "I contacted him several times, and—and I'm still sitting here. . . . So five years later, not done." The evidence therefore clearly and convincingly showed that Mr. Curnutte failed to make reasonable efforts to expedite the litigation consistent with Mr. McFarlan's interests.

**B.** *Lambert Estate Matter*

In support of his argument that he did not violate Rule 3.2, which required reasonable efforts to expedite Mr. Lambert's litigation consistent with his interests, Mr. Curnutte here too claims that outside factors hindered resolution of the matter. Mr. Curnutte asserts that while Mr. Lambert's case was pending before the county commission, the commission cancelled hearings. Once the case was removed to circuit court, the court

---

[9] *See id.*

13

failed to hold a scheduling conference until Mr. Curnutte noticed a status conference. Also, opposing counsel was reportedly difficult and unresponsive.

At the HPS hearing, Mr. Lambert's attorney-in-fact, Carolyn Channell, testified on his behalf.[10] Considering that Mr. Lambert retained Mr. Curnutte in 2016, Ms. Channell testified that the matter "should have been done six or seven years ago." Eventually, in September 2023, a settlement was reached, but according to Ms. Channell, Mr. Lambert still had not "received a penny" from his late wife's estate. When payments were not forthcoming following the settlement and calls to Mr. Curnutte went unreturned, Ms. Channell testified to visiting Mr. Curnutte's office: "And I said, 'What's going on with this? I want the money today. I want the money today.['] . . . That was on Friday. And I said, 'I'll give you until Monday.'" When the money did not appear in Mr. Lambert's bank account, Ms. Channell called Mr. Curnutte's office, but there was "[n]o answer." While Mr. Curnutte asserted that he filed a motion to enforce the settlement and a petition for contempt, Ms. Channell countered that the filing came only after she "kept after" him

_____

[10] Ms. Channell, who was Mr. Lambert's attorney-in-fact at the time he retained Mr. Curnutte, also assisted Mr. Lambert in retaining Mr. Curnutte, was present during meetings between Mr. Lambert and Mr. Curnutte, attended hearings in the litigation, and was otherwise well aware of the litigation and Mr. Curnutte's efforts, or lack thereof, in pursuing this matter.

"1,500 times."[11] She also acknowledged that "[Mr. Curnutte's] a good lawyer if he'd just do it."

The evidence before the HPS showed that some delay in this then-eight-year-old case could be attributed to outside factors, but it also clearly and convincingly showed that Mr. Lambert, through Ms. Channell, persisted in seeking a resolution to this case and that Mr. Lambert had yet to receive that resolution. Any legitimate delays cannot account for the overall length of time the case remained unresolved, particularly in view of the damage to Mr. Curnutte's credibility resulting from the discrepancy between how Mr. Curnutte claimed he acted in representing his clients and how he in fact acted toward ODC. So, Mr. Curnutte has not sustained his burden of showing that the reliable, probative, and substantial evidence did not support the HPS's finding that Mr. Curnutte failed to make reasonable efforts to expedite Mr. Lambert's litigation consistent with his interests.

C.      *Kramer Mediation*

Before this Court, Mr. Curnutte continues to maintain that he served as a private mediator in Mr. Kramer's family court mediation. For this reason, he claims he was not required to memorialize the mediated settlement under Rule 43 of the Rules of Practice and Procedure for Family Court, which, he contends, "by its plain terms applies

_____

[11] At the mention of "1,500 times," Mr. Curnutte retorted, "Well, it wasn't 1,500. You and I both know it wasn't 1,500."

15

to court-[ordered] mediations, not private mediations." Mr. Curnutte also notes that the party opposing Mr. Kramer withdrew from the agreement within two days of mediation, so there was nothing to memorialize. And because he was not required to memorialize the mediated agreement, he did not violate Rule 43, and he therefore did not violate Rule 3.4(c) of the Rules of Professional Conduct.

Rule 3.4(c) provides that "[a] lawyer shall not: . . . (c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." The "obligation under the rules of a tribunal" Mr. Curnutte was found to have knowingly disobeyed was Rule 43 of the Rules of Practice and Procedure for Family Court. Rule 43 requires, among other things, that

> [w]ithin five days of the conclusion of mediation, the mediator shall reduce any mediated agreement to writing on the required form; prepare a Mediation Outcome Report on the required form; file the agreement with the circuit clerk; send copies of the agreement to the parties; and send a copy of the report to the court."[12]

We need not determine whether Rule 43 is as narrowly applicable as Mr. Curnutte argues because the evidence showed that the mediation was court ordered. Mr. Kramer was represented in that family court matter by attorney Phillip S. Isner. In response to a request from ODC, Mr. Isner recounted that "[t]he parties were ordered to participate

---

[12] W. Va. R. Prac. & Proc. Fam. Ct. 43(c).

in mediation on or before April 18, 2022." The parties were unable to meet this deadline, however, due to "scheduling issues with the appointed mediator," so "the court ordered that the parties participate in mediation with a different mediator on April 29, 2022"—the date Mr. Curnutte served as mediator for Mr. Kramer's matter. Also, at the HPS hearing, Mr. Kramer testified that the mediation was court ordered. Further still, in Mr. Curnutte's Answer to the Statement of Charges, he *admitted* that the mediation had been ordered by the family court. So even if Rule 43 applies only to court-ordered mediation, the evidence clearly and convincingly showed that that is the type of mediation Mr. Curnutte conducted. And the evidence showed that the opposing party withdrew from the mediated agreement weeks, not days, after it was conducted. So, Mr. Curnutte has not sustained his burden of showing that the evidence did not support the HPS's conclusion that he violated Rule 3.4(c) by failing to memorialize the parties' agreement within five days of the mediation's conclusion.

Although Mr. Curnutte focuses his challenge to the violations found in the Kramer matter on the applicability of Rule 43, and therefore the evidence to support a violation of Rule 3.4(c), we nevertheless find that clear and convincing evidence supported the HPS's conclusion that Mr. Curnutte also violated Rule 8.4(d). That rule provides that "[i]t is professional misconduct for a lawyer to: . . . (d) engage in conduct that is prejudicial to the administration of justice." Mr. Curnutte informed the parties to the mediation that he would prepare the mediation agreement within a matter of days, and he testified that he intended to prepare the mediation agreement because counsel for the party opposing Mr.

17

Kramer was switching law firms and "anxious to get out of there," and he was "pretty sure Mr. Isner would not carry through with preparing the agreement." In short, Mr. Curnutte recognized the need for preparing a mediation agreement, believed that it would not get prepared if he did not do it, told the parties he would prepare it, but then failed to prepare it. The evidence clearly and convincingly showed that he engaged in conduct that was prejudicial to the administration of justice.

**D.** *Sanction*

Having found that Mr. Curnutte committed violations of the Rules of Professional Conduct, we now turn to the appropriate sanction. We consider four factors:

> Rule 3.16 of the Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: "In imposing a sanction after a finding of lawyer misconduct, unless otherwise provided in these rules, the Court [West Virginia Supreme Court of Appeals] or Board [Lawyer Disciplinary Board] shall consider the following factors: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession; (2) whether the lawyer acted intentionally, knowingly, or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors."[13]

---

[13] Syl. Pt. 4, *Off. of Law. Disciplinary Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

Regarding the first factor, which is whether a lawyer has violated a duty owed to a client, the public, the legal system, or the legal profession, we have explained that

> [a] lawyer owes an ethical duty to clients including the duty of candor, loyalty, diligence, and competence. Lawyers also owe duties to the public who rely on lawyers to protect their interests. The general public deserves lawyers with the highest standards of honesty and integrity. As officers of the court, lawyers owe duties to the legal system whereby they must conduct themselves within the bounds of the law and abide by the rules of substance and procedure which afford the administration of justice. As to the legal profession, lawyers owe an ethical duty to maintain the integrity of the profession.[14]

Mr. Curnutte clearly violated his ethical duties to his clients. He neglected and failed to take appropriate action in Mr. McFarlan's case, thereby failing to act diligently and promptly in his representation. He also failed to expedite both Mr. McFarlan's and Mr. Lambert's litigation—indeed, Mr. Curnutte failed to take *any* action to propel their litigation forward—and he failed to keep Mr. McFarlan informed as to the status of the matter and to respond to his reasonable requests for information.

Mr. Curnutte also violated duties to the public, the legal system, and the legal profession. The public "depends on lawyers to navigate the legal system,"[15] so for the same reasons he violated duties to his clients, he violated duties to the public. And violating

---

[14] *Law. Disciplinary Bd. v. Blyler*, 237 W. Va. 325, 341, 787 S.E.2d 596, 612 (2016).

[15] *Law. Disciplinary Bd. v. Schillace*, 247 W. Va. 673, 684, 885 S.E.2d 611, 622 (2022).

a court rule and subverting the disciplinary process by failing to respond to ODC's lawful requests for information constituted breaches of his duties to the legal system and the legal profession. As Mr. Curnutte acknowledged before the HPS, "I don't think the process works very well unless the ODC has some ability to require lawyers to respond to requests, reasonable requests for information." He also acknowledged "that the process does need to—to work in a professional organization like the state bar and that [his] conduct [in not responding to ODC] fell below what should be expected of a professional in any—in any profession, but certainly our profession."

In evaluating the second factor, we have recognized a hierarchy of culpability applicable to the mental state of a lawyer such as Mr. Curnutte:

> [t]he American Bar Association Standards for Imposing Lawyer Sanctions instruct that the most culpable mental state is that of intent, which consists of conduct by the lawyer with a conscious objective or purpose to achieve a particular result. The next most culpable mental state is that of knowledge when there are acts by the lawyer with the awareness of the nature of the acts or the potential consequences of the conduct. However, with the state of knowledge there is no conscious effort to attain a particular result. The least culpable mental state is negligence, which involves a failure to be aware of substantial risks at issue.[16]

HPS concluded, and we agree, that Mr. Curnutte acted intentionally and knowingly. Mr. Curnutte's clients repeatedly sought information and action, and in

---

[16] *Blyler*, 237 W. Va. at 341, 787 S.E.2d at 612.

20

addition to their repeated requests and expressed frustration, his decades of experience practicing law made him well aware of the potential consequences of failing to act diligently.  He also had a strong suspicion that the mediation report in the Kramer matter would not get prepared, committed to preparing it himself, and then failed to prepare it. Moreover, Mr. Curnutte acknowledges repeatedly ignoring the ODC:  "[I]t's indisputable . . . that I did not respond to requests of the ODC for information.  That was wrong of me, and as I pointed out earlier, it wasn't just a single time and, therefore, down to an oversight or a bad week kind of situation."

Moving to an assessment of the third factor, we find that Mr. Curnutte's misconduct caused actual injury.  "[W]e have emphasized that case delay and understandable frustration with the system establish actual injury."[17]  Mr. McFarlan testified that he felt "[v]ery frustrated" when Mr. Curnutte failed to return his calls, and the lack of resolution has caused him to be "pretty stressed out about it for the last few years." Mr. Curnutte's failure to follow through with his commitment to prepare the mediation agreement for Mr. Kramer affected Mr. Kramer's trust in lawyers, leaving him without "faith" that an attorney will "follow through with their professional obligations in a timely manner."  And even Mr. Curnutte recognized Ms. Channell's frustration:  "I agree that she

---

[17] *Shillace*, 247 W. Va. at 685, 885 S.E.2d at 623 (citation omitted).

is frustrated, and I agree it's certainly understandable that—the case has been pending for a long period of time."

Finally, we consider mitigating and aggravating factors before turning to the appropriate sanction. Mitigating factors are those that "may justify a reduction in the degree of discipline to be imposed"[18] and can include

> (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12); remorse; and (13) remoteness of prior offenses.[19]

Aggravating factors, on the other hand, are "any considerations or factors that may justify an increase in the degree of discipline to be imposed."[20] They include

> (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with rules or orders of the disciplinary

---

[18] *Id.* at 686, 885 S.E.2d at 624 (quoting Syl. Pt. 2, in part, *Law. Disciplinary Bd. v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003)).

[19] *Id.* (quoting *Scott*, 213 W. Va. at 210, 579 S.E.2d at 551, Syl. Pt. 3, in part).

[20] *Id.* at 687, 885 S.E.2d at 625 (quoting *Scott*, 213 W. Va. at 210, 579 S.E.2d at 551, Syl. Pt. 4, in part).

22

agency; (f) submission of false evidence, false statements, other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution; (k) illegal conduct, including the use of controlled substances.[21]

The HPS identified Mr. Curnutte's "cooperative attitude toward proceedings" as a mitigating factor. It observed that he "maintained a cooperative attitude" and "professionalism" at the "hearing stage of this [c]ase." We afford this finding due weight, emphasizing that his cooperation came at the *hearing stage*, not when ODC sought his cooperation in addressing the complaints filed.

As for aggravating factors, we find, as did the HPS, that Mr. Curnutte exhibited a pattern and practice of failing to respond to ODC, and he has substantial experience in the practice of law. Critically, Mr. Curnutte also has been subject to prior disciplinary action.[22] In 2020, this Court suspended his law license for ninety days for falsely reporting to the State Bar that he was covered by professional liability insurance when he knew that information was false.[23] He also provided false policy information to

---

[21] *Id.* at 687-88, 885 S.E.2d at 625-26 (citation omitted).

[22] *See Law. Disciplinary Bd. v. Curnutte*, 243 W. Va. 617, 849 S.E.2d 617 (2020).

[23] *Id.* at 621-22, 627, 849 S.E.2d at 621-22, 627.

a lawyer he hired to work in his firm, causing her to misrepresent that coverage to the State Bar.[24]

So, Mr. Curnutte violated duties to clients, the public, the legal system, and the profession; he acted intentionally and knowingly; he caused actual injury; and there are several aggravating factors and only one mitigating factor that came late in the process. Still, Mr. Curnutte disputes that the six-month sanction recommended by HPS is appropriate. He states that the HPS failed to account for the fact that he services a "rural" and "under-served" community, so a suspension would leave that community "bereft of representation."

We begin by rejecting Mr. Curnutte's argument that our determination as to sanction must account for the fact that he practices in a rural community. In *Lawyer Disciplinary Board v. Davis*,[25] Mr. Davis argued that a six-month suspension was excessive and advanced the same argument as Mr. Curnutte in support of that position.[26] Although we "applaud[ed]" Mr. Davis's "concern for the legal needs of his community," we cited to "the need to protect this very community" in imposing a six-month sanction.[27] This is

---

[24] *Id.* at 621-22, 849 S.E.2d at 621-22.

[25] No. 20-0871, 2022 WL 421119 (W. Va. Feb. 11, 2022) (memorandum decision).

[26] *Id.* at *7.

[27] *Id.*

24

because "[t]he [Rules of Professional Conduct] state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action."[28]  In other words, the Rules are the floor; the requirements imposed by them are not downwardly adjusted in areas with fewer attorneys.  To the contrary, those areas must be protected just the same as more populated ones.

So instead of the considerations urged by Mr. Curnutte, we must consider the following:

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.[29]

Of course, "[t]here is no 'magic formula' for this Court to determine how to weigh the host of mitigating and aggravating circumstances to arrive at an appropriate sanction,"[30] and "each case presents different circumstances that must be weighed against the nature and

---

[28] Syl. Pt. 9, *Comm. on Legal Ethics of The W. Va. State Bar v. Cometti*, 189 W. Va. 262, 430 S.E.2d 320 (1993) (quoting Syl. Pt. 3, *Comm. on Legal Ethics v. Tatterson*, 173 W. Va. 613, 319 S.E.2d 381 (1984)).

[29] Syl. Pt. 3, *Comm. on Legal Ethics of the W. Va. State Bar v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

[30] *Law. Disciplinary Bd. v. Sirk*, 240 W. Va. 274, 282, 810 S.E.2d 276, 284 (2018).

gravity of the lawyer's misconduct,"[31] but the *Davis* case provides a good benchmark for fashioning a sanction that is appropriate here.

Like Mr. Curnutte, Mr. Davis failed to act diligently in representing his client, failed to communicate with his client, engaged in conduct prejudicial to the administration of justice, and failed to respond to ODC's request for information.[32] Also like Mr. Curnutte, Mr. Davis had substantial experience practicing law, was found to have acted knowingly, and had received prior disciplinary sanctions.[33] Against that background, we imposed a six-month suspension and other sanctions.[34]

A six-month suspension, along with the other sanctions recommended by HPS, is warranted here, too. Mr. Curnutte established a pattern and practice of neglecting his clients' cases, failing to communicate with them, and failing to take action on their behalf. His failures caused his clients frustration and brought disrepute to the profession. He neglected his responsibilities as a mediator, frustrating both Mr. Kramer and the administration of justice, and he continually ignored lawful requests for information from ODC. Along with the other sanctions recommended by HPS, we find that a six-month

---

[31] *Id.*

[32] *Davis*, 2022 WL 421119, at *3.

[33] *Id.*

[34] *Id.* at *8.

suspension of Mr. Curnutte's law license is necessary to appropriately punish, to effectively deter other members of the State Bar, and to restore public confidence in the ethical standards of the legal profession.

## IV. CONCLUSION

For the reasons stated above, we impose the following sanctions: (1) we suspend Mr. Curnutte's law license for six months and direct him to comply with the requirements of Rule 3.28 of the Rules of Lawyer Disciplinary Procedure; (2) Mr. Curnutte is required to petition for reinstatement under Rule 3.32 of the Rules of Lawyer Disciplinary Procedure; and (3) Mr. Curnutte must reimburse the Lawyer Disciplinary Board for the costs of these proceedings under Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

Law license suspended and other sanctions imposed.